IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

LANA P. BLANKS                    )
                                  )
v.                                )          CIVIL NO. 3:08-1092
                                  )
MICHAEL J. ASTRUE,                )
Commissioner of Social Security   )


To: The Honorable John T. Nixon, Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claim for Disability Insurance Benefits ("DIB"), as provided by the Social Security Act ("the Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff could perform her past work during the relevant time period is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 12) should be denied.

# I. INTRODUCTION

The plaintiff filed an "amended" application for DIB on April 19, 2005 (tr. 68),[1] alleging a disability onset date of February 2, 2004, due to pseudogout in her right hip, arthritis in her back, and recurring back problems. (Tr. 68, 84.) Her application was denied initially and upon reconsideration. (Tr. 49-51, 54-56.) A hearing before Administrative Law Judge ("ALJ") William F. Taylor was held on January 11, 2008. (Tr. 507-28.) The ALJ delivered an unfavorable decision on April 7, 2008 (tr. 16-18), and the plaintiff sought review of that decision by the Appeals Council. (Tr. 15.) While the case was pending before the Appeals Council, the plaintiff amended her alleged onset date to May 23, 2007. (Tr. 489-90.) On September 11, 2008, the Appeals Council denied the plaintiff's request for review (tr. 6-9), and the ALJ's decision became the final decision of the Commissioner.

# II. BACKGROUND

The plaintiff was born on October 31, 1955 (tr. 68), and was 48 years old as of February 2, 2004, the date she initially alleged as her onset date. She completed high school and received specialized training in office and computer work from Draughon's Business College in 1990 (tr. 89), and she had worked as an administrative assistant, bookkeeper, computer technician, office manager, photocopy supervisor, and telecommunications technician. (Tr. 85.)

---

[1] The Social Security Administration's initial determination and reconsideration forms indicate that the plaintiff filed her DIB application on March 19, 2005 (tr. 47-48), but the ALJ and Commissioner list the plaintiff's DIB application date as March 29, 2005. Tr. 19; Docket Entry No. 20, at 1.

## A. Chronological Background: Procedural Developments and Medical Records

In 1993, Dr. Timothy P. Schoettle, a neurologist, examined the plaintiff on multiple occasions (tr. 301-317), diagnosed her with radiculopathy[2] and spondylolisthesis,[3] which was confirmed by an MRI and CT myelogram (tr. 315-16, 384), and performed a unilateral laminectomy and radicular posterior decompression on her spine. (Tr. 313, 409-10.)  Dr. Schoettle performed several post-operative follow-up exams and found that the plaintiff was "doing exceptionally well . . . [and had] total resolution of her left hip and leg pain, with some occasional tingling in the foot, and only minor postoperative pain that has been well controlled with Motrin" (tr. 312) and that her "severe neck pain" and headaches were treatable with Soma[4] and physical therapy. (Tr. 311.)  In November of 1993, the plaintiff had surgery to correct meningocele.[5] (Tr. 301-07, 439-42.)

Between 1994 and 1996, Dr. Schoettle examined the plaintiff on several occasions,  noted that the plaintiff was experiencing minimal radiculopathic pain and that her back and hip were improving, and prescribed Daypro.[6] (Tr. 293- 300.)   Examinations in June and October of 1994 indicated that the plaintiff experienced virtually no radiculopathic pain, minimal pain from standing at length, and some arthritic pain, and that she returned to work with lifting restrictions. (Tr.

---

[2] Lumbar radiculopathy is the disease of the nerve roots and nerves in the lower back. Dorland's Illustrated Medical Dictionary 1562 (30th ed. 2003) ("Dorland's").

[3] Spondylolisthesis is the "forward displacement [] of one vertebra over another . . . usually due to a developmental defect in the pars interarticularis." Dorland's at 1743.

[4] Soma is used for the relief of discomfort associated with acute and painful musculoskelatal conditions. Physicians Desk Reference 1931 (63rd ed. 2009) ("PDR").

[5] A meningocele is the hernial protrusion of the protective membranes of the spinal cord through the vertebral column. PDR at 1004.

[6] Daypro is a nonsteroidal anti-inflammatory drug that is used to treat osteoarthritis and rheumatoid arthritis. Saunders Pharmaceutical Word Book 203 (2009) ("Saunders").

299-300.)  On January 18, 1996, the plaintiff underwent a carpal tunnel release operation for her right carpal tunnel syndrome. (Tr. 239-40.)

On February 29, 2000, the plaintiff presented to Dr. Robert P. Lagrone, a rheumatologist, with complaints of right ankle swelling, chronic fatigue, and migrating joint pain in her back, knees, and ankles. (Tr. 210, 214.)  Dr. Lagrone diagnosed her with "osteoarthritis of the lumbar spine" and myofascial pain,[5] and prescribed Vioxx,[6] Prednisone,[7] and Estratest.[8] (Tr. 213-14.)  Dr. Lagrone examined the plaintiff in April and November of 2000, noted that she was "doing pretty well with Vioxx" and that "she tends to 'poop out', but I think this is due to poor conditioning, rather than the OA [osteoarthritis] in her knees and back," and prescribed Prednisone. (Tr. 209-10.)

A January 10, 2002, MRI of the plaintiff's spine indicated that she had a disc bulge that "mild to moderately narrow[s] both neural foramina," "efface[s] the cal sac," and "slightly flatten[s] the cord." (Tr. 253-54.)  On January 22, the plaintiff presented to Dr. Schoettle with complaints of arm and neck pain and weakness that worsen with sitting and improve with bed rest and that cause her to "drop[] things." (Tr. 286-87.)  Dr. Schoettle diagnosed her with a limited range of motion and a central HNP [herniated nucleus pulposus][9] and referred her to physical therapy. (Tr. 284-87.)  On

---

[5] Myofascial pain is chronic muscle pain, centering upon sensitive points in muscles called trigger points, often painful to touch and radiating pain throughout the muscle. Mayo Clinic, "Myofascial Pain Syndrome," http://www.mayoclinic.com/health/myofascial-pain-syndrome /DS01042.

[6] Vioxx was withdrawn from the market in 2004, but was a nonsteroidal anti-inflammatory drug used to treat various forms of arthritis. Saunders at 756.

[7] Prednisone is a corticosteroidal anti-inflammatory drug. Saunders at 575.

[8] Estratest is a hormone replacement pill. Saunders at 271.

[9] A herniated nucleus pulposus is a herniation of an intervertebral disc or slipped disc. Dorland's at 1289.

-4-

January 28, 2002, Ginger Morgan, a physical therapist, evaluated the plaintiff and found that she had no reflexive or motor deficits, a normal range of motion with some discomfort in her cervical vertebrae, and some pain in her right upper extremity. (Tr. 284.) The plaintiff was prescribed a Medrol Dosepak.[10] *Id.*

The plaintiff returned to Ms. Morgan for multiple physical therapy sessions in February of 2002 and, although she made some progress, she continued to complain of central cervical vertebrae discomfort. (Tr. 279-82.) On February 21, 2002, Dr. Schoettle examined the plaintiff and related that she had made "very little progress" with physical therapy and would require surgery to correct her C5-6 disc herniation. (Tr. 278.) On February 25, 2002, Dr. Schoettle performed an anterior cervical C5-6 diskectomy (tr. 273-77) and at a post-operative follow-up examination, the plaintiff reported that she had "no real pain," that aching in her right arm and left elbow had decreased dramatically, that she was not using pain medication, and that she was able to return to work. (Tr. 271.) The plaintiff also reported having upper groin and left thigh pain and Dr. Schoettle prescribed Neurontin[11] and Levaquin.[12] *Id.* A March 26, 2002, x-ray of the plaintiff's cervical spine revealed mild cervical kyphosis[13] at C4-5 and mild anterior osteophytic changes at C6-7. (Tr. 272.)

---

[10] Medrol Dosepak is anti-inflammatory medication. Saunders at 433.

[11] Neurontin is indicated for treatment of neuralgia and pain. Saunders at 488.

[12] Levaquin is used to treat or prevent infections caused by susceptible bacteria. PDR at 2630.

[13] Cervical kyphosis is abnormal curvature of the neck that can cause neck pain. Dorland's at 986.

On April 23, 2002, the plaintiff presented to Dr. Lagrone with "true hip pain" and he gave her a Bextra[14] injection. (Tr. 209.) An April 30, 2002, x-ray of the plaintiff's spine revealed "[c]ervical kyphosis, with very minimal grade I anterolisthesis[15]" and degenerative disc disease at C6-7 with minimal grade I anterolisthesis. (Tr. 270.) The plaintiff also reported to Leslie West, a registered nurse at Dr. Schoettle's office, that she had mild aching in her right arm and "some" right leg pain, that she was no longer experiencing sharp pain, and that she required no pain medication and was working without difficulty. (Tr. 269.) On June 21, 2002, Dr. Lagrone examined the plaintiff, noted that an injection in her right hip had not provided any relief, diagnosed her with CPPD[16] ("pseudogout"), and prescribed Vioxx, Prednisone, and Ultracet.[17] (Tr. 209, 211.)

On referral from Dr. Lagrone, Dr. Wesley L. Coker examined the plaintiff on June 27, 2002, and diagnosed her with pseudogout of the right hip and prescribed Indocin.[18] (Tr. 497.) In July of 2002, Dr. Coker examined the plaintiff on two occasions and found that her right hip condition had not responded to Indocin or steroid injections. (Tr. 495-96.) He opined that he did not "know of any medication that we can give her or anything that we can do that is going to alter the progress of this

---

[14] Bextra is no longer available in the United States but it was a nonsteroidal anti-inflammatory drug prescribed for arthritis. Saunders at 95.

[15] Anterolisthesis is synonymous with spondylolisthesis or the anterior displacement of a vertebral disc. Dorland's at 97, 1743.

[16] CPPD, or pseudogout, is an arthritic condition marked by attacks of gout-like symptoms and associated with calcium deposits in cartilaginous joint structures. Dorland's at 272, 1533.

[17] Ultracet is a central analgesic prescribed for acute pain and as a fever reducer. Saunders at 738.

[18] Indocin, also known as indomethacin, is a nonsteroidal anti-inflammatory drug that is used to treat rheumatoid arthritis, osteoarthritis, ankylosing spondylitis, acute gouty arthritis, and other rheumatic and nonrheumatic inflammatory conditions. Dorland's at 926.

disease process" and encouraged the plaintiff "just to be active and enjoy life and we will see what happens." (Tr. 495.) Dr. Lagrone also examined the plaintiff in July of 2002, noted that he did not "know anything else to do" for her pseudogout, and proposed that "we simply try different NSAID's [nonsteroidal anti-inflammatory drugs], hoping to find one which is more helpful." (Tr. 209.)

In September and October of 2004, Dr. Douglas C. Beatty, an internist, examined the plaintiff, diagnosed her with hypertension, dyslipidemia, obesity, and pseudogout, and prescribed Diovan.[19] (Tr. 179-82.) On December 2, 2004, the plaintiff presented to Dr. Lagrone with complaints of right hip pain and he opined that although hip replacement surgery "maybe [her] only option," she would not be able to have the surgery since she did not have insurance. (Tr. 209.) In January and February of 2005, Dr. Beatty examined the plaintiff, diagnosed her with pseudogout, hypertension, and obesity, and prescribed Decadron,[20] Percocet,[21] and Soma.[22] (Tr. 175-78.) The plaintiff also complained of having neck pain and stiffness. (Tr. 176.) On March 30, 2005, the plaintiff received a steroid injection in her right hip. (Tr. 211, 228.)

In May of 2005, Dr. Beatty completed a Tennessee Disability Determination Section ("DDS") mental evaluation and found that the plaintiff did not suffer from a mental impairment.[23] (Tr. 173-74.) He also examined the plaintiff and diagnosed her with an infection or subcutaneous

---

[19] Diovan is an angiotensin II receptor blocker prescribed for hypertension. PDR at 2413.

[20] Decadron is a corticosteroidal anti-inflammatory. Saunders at 204.

[21] Percocet is an opioid analgesic. PDR at 1121.

[22] Soma is a skeletal muscle relaxant. Saunders at 653.

[23] The Court assumes Dr. Beatty completed this form since it is included within his treatment records, although he did not sign it.

cyst. (Tr. 321-22.)  From June to December of 2005, Dr. Beatty examined the plaintiff on multiple occasions and diagnosed her with dyslipidemia, obesity, and hypertension. (Tr. 323-30.)

On July 11, 2005, Dr. Janet Pelmore, a DDS consultative examiner, completed a physical evaluation (tr. 183-88) and noted that the plaintiff complained of constant pain in her right hip and lower back. (Tr. 186.)  Dr. Pelmore found that the plaintiff did not use an assistive device or need assistance getting on or off the examining table, that her back was not tender, but she could not fully extend her right hip, and that she had difficulty squatting and rising. (Tr. 186-88.)  Additionally, range of motion tests showed that the plaintiff's back extension and flexion and neck rotation were slightly limited. (Tr. 191.)  Dr. Pelmore diagnosed the plaintiff with pseudogout of the right lower extremity, degenerative joint disease of the cervical and lumbosacral spine, obesity, and controlled hypertension. (Tr. 188.)

Dr. Pelmore also completed a Medical Assessment of Ability to Do Work-Related Activities ("Medical Assessment") and determined that in an eight hour workday the plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently, could stand/walk for at least two hours, and could sit for at least six hours. (Tr. 189-90.)  On July 31, 2005, Dr. Denise Bell, a non-examining DDS physician, completed a residual functional capacity assessment ("RFC") (tr. 192-97) and opined that in an eight hour workday the plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently, could stand/walk for at least six hours, and could sit for at least six hours. (Tr. 193.)  She also determined that the plaintiff's ability to push/pull was unlimited and that she could frequently climb, balance, stoop, kneel, crouch, and crawl. (Tr. 194.)

In January and February of 2006, Dr. Mitchell A. Pullias examined the plaintiff on three occasions and noted that she complained of left chest pain, abdominal pain, and fatigue. (Tr. 231,

233-34.) He diagnosed her with type II diabetes, hypertension, chest wall pain, abdominal pain, iron deficiency anemia, fatigue, and myalgias. *Id.* He also found that she had a decreased range of motion in her right hip (tr. 234), that she should visit her rheumatologist and "consider [having] discussions about [a] possible diagnosis of fibromyalgia" (tr. 231), and prescribed Metformin,[24] Lisinopril,[25] and Mirtazapine.[26] (Tr. 231, 233-34.) On February 7, 2006, she presented to the emergency room at StoneCrest Medical Center with abdominal pain and rectal bleeding, and a CT scan of the plaintiff's abdomen and pelvis showed diffuse diverticulosis[27] of the colon. (Tr. 202, 206.) The plaintiff was hospitalized for a five day period for treatment of acute gastrointestinal hemorrhage, acute diverticulitis, and syncopal episode.[24] (Tr. 198-207.)

From February of 2006, to July of 2006, the plaintiff presented to Dr. Lagrone on three occasions with pain in her hip, back, arms, knee, and ankle. (Tr. 354.) Dr. Lagrone diagnosed her with right hip pain, myofascial pain, pseudogout, and degenerative arthritis, and prescribed Lyrica,[25]

---

[24] Metformin is an antidiabetic drug prescribed for type II diabetes. Saunders at 441.

[25] Lisinopril is an antihypertensive drug prescribed for congestive heart failure. Saunders at 411.

[26] Mirtazapine is antidepressant medication. Saunders at 456.

[27] Diverticulosis is the presence of acquired herniations of the mucosa of the colon through the muscular layers of the bowel wall, which may become inflamed, producing diverticulitis. Dorland's at 556.

[24] Syncopal episode is the medical term for a sudden loss of consciousness or fainting. Dorland's at 1807.

[25] Lyrica is indicated for diabetic neuropathic pain, neuralgia, and fibromyalgia. PDR at 2731.

Cymbalta,[26] and Ultracet. *Id*. He also noted that the plaintiff's hip pain was due to pseudogout crystals and degenerative arthritis but that her back and extremity pain was myofascial pain, "essential[ly] a synonym for Fibromyalgia-type pain." *Id.*

In March of 2006, Kecia Wisdom, a nurse in Dr. Pullias' office, examined the plaintiff and noted that she had "[n]o muscle joint pain, weakness, swelling or inflammation. No restriction of motion, no atrophy or backache." (Tr. 229.) On November 27, 2006, Dr. Pullias examined the plaintiff and found that she was "[d]oing well overall," that she had normal aches and pains which were "under reasonable control per her rheumatologist," and that her diabetes and hypertension were satisfactory but that her hyperlipidemia "was not at goal." (Tr. 366-67.) On January 5, 2007, Dr. Lagrone examined the plaintiff, found that her condition was unchanged and that she was "able to function with Ultracet and Cymbalta," and changed her prescription from Ultracet to Tramadol[27] for cost purposes. (Tr. 354.)

On July 27, 2007, James Proffitt, a senior psychological examiner and health services provider with Behavioral Diagnostics, completed a psychological evaluation (tr. 343-48) and opined that the plaintiff walked stiffly and "sometimes appeared to be in pain." (Tr. 344.) Mr. Proffitt administered the Wechsler Adult Intelligence Scale-Third Edition ("WAIS-III") test to the plaintiff and her verbal IQ score was 106, her performance IQ score was 109, and her full scale IQ score was 108. (Tr. 345-46.) He noted that the plaintiff was significantly distressed about her physical problems and that "[h]er depression appears to be cognitive rather than physiological." (Tr. 346.)

---

[26] Cymbalta is prescribed for major depressive disorder, generalized anxiety disorder, diabetic neuropathic pain, and fibromyalgia. PDR at 1872. Dr. Lagrone prescribed Cymbalta for the plaintiff's myofascial pain. (Tr. 354.)

[27] Tramadol is a pain reliever that is used to treat moderate to severe pain. Saunders at 715.

The plaintiff reported that her activities of daily living include doing the laundry, grocery shopping, cooking, and attending church. (Tr. 347.) Mr. Proffitt opined that the plaintiff had dysthymic disorder,[28] fibromyalgia, diverticulosis, and pseudogout, and he assigned her a GAF score of 50.[29] (Tr. 347-48.)

On September 18, 2007, the plaintiff presented to Dr. Pullias with complaints of intermittent right ear and jaw pain, worsening allergy symptoms, and nocturnal chest pain (tr. 362) and he noted that the plaintiff's diabetes, hypertension, hyperlipidemia, and depression were stable, and that he was willing to refer her for an evaluation for chronic pain management.[31] (Tr. 363-64.) Dr. Pullias prescribed Metformin, Lovastatin,[32] Lisinopril, and Cymbalta. *Id.* On October 19, 2007, Dr. Lagrone examined the plaintiff and opined that she continued to suffer from back and hip pain

---

[28] Dysthymic disorder is characterized by a chronically depressed mood that occurs for more than two years. This differs from depressive disorder in that there are less severe depressive symptoms that are present for a number of years. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 377-80 (4th ed. 2000) ("DSM-IV-TR").

[29] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. DSM-IV-TR at 34. A GAF score of 41-50 falls within the range of "[s]erious symptoms [or] any serious impairment in social, occupational, or school functioning." DSM-IV-TR at 34.

[31] There is no indication in the record that the plaintiff ever had such an evaluation.

[32] Lovastatin is prescribed to treat hyperlipidemia. Saunders at 416.

that was "mainly myofascial" in nature[33] and that her poor sleeping habits had aggravated her fibromyalgia. (Tr. 487.) He prescribed Ultracet, Cymbalta, and Lyrica. *Id.*

On December 11, 2007, the plaintiff presented to Dr. Pullias with complaints of skin lesions, right thumb pain, and chest pain. (Tr. 460.) Dr. Pullias noted that the plaintiff had a normal gait, that her diabetes was "satisfactory," and that her hyperlipidemia was "near goal." (Tr. 461-62.) He diagnosed the plaintiff with esophageal reflux, trigger finger, a rash, and chest wall pain, and opined that she appeared in no distress, had appropriate judgment, had a normal memory, mood, and affect, and that her neurotic depression was "[s]table on Cymbalta." *Id.* On January 4, 2008, Dr. Lagrone examined the plaintiff and injected her right thumb with Dexamethasone.[34] (Tr. 498.) On January 17, 2008, the plaintiff presented to Dr. Michael A. Milek, an orthopedist, and he found that her metacarpophalangeal joint ("MP joint") was tender. (Tr. 500.) An x-ray of the plaintiff's right thumb revealed elements of arthritis in the CMC joint but it was largely unremarkable, and Dr. Milek injected her right thumb with Xylocaine.[34] (Tr. 500.)

---

[33] In his October 19, 2007, treatment note Dr. Lagrone diagnosed the plaintiff with both myofascial pain and fibromyalgia but in a July 17, 2006, treatment note, in which he also diagnosed her with myofascial pain, he explained that myofascial pain is "essential[ly] a synonym Fibromyalgia-type pain." (Tr. 487.) However, fibromyalgia and myofascial pain are two distinct diagnoses. According to the Mayo Clinic, fibromyalgia is characterized by "[w]idespread pain lasting at least three months" and "[n]o other underlying condition that might be causing the pain," while myofascial pain syndrome is persistent muscle pain that "centers around sensitive points in your muscles called trigger points" and is diagnosed through the manipulation of those trigger points. MayoClinic.com, "Fibromyalgia," http://www.mayoclinic.com/health/fibromyalgia/DS00079/DSECTION=tests-and-diagnosis; MayoClinic.com, "Myofascial pain syndrome" http://www.mayoclinic.com/health/myofascial-pain-syndrome/DS01042.

[34] Dexamethasone is a corticosteroidal anti-inflammatory. Saunders at 215.

[34] Xylocaine is a local anesthetic. Saunders at 770.

**B. Hearing Testimony**

At the hearing before the ALJ, the plaintiff was represented by counsel, and the plaintiff and Dr. Gordon Doss, Ph.D., a vocational expert ("VE"), testified. (Tr. 507-28.) The plaintiff testified that she graduated from high school and attended "business college for about six months," that she is able to drive, and that she worked at Summit Learning Systems ("Summit") from January of 2005, to May of 2007. (Tr. 510-11, 514.) The plaintiff testified that in 2005 she made $9,228.75, that in 2006 she made $9,525.00, and that in 2007 she worked about 15 hours a week and made about $800 per month. (Tr. 513-14.) She explained that she began working at Summit as a bookkeeper but that she was transferred to another position that required her only to delete files, because she was "making mistakes." (Tr. 514-15.) The plaintiff testified that at work she had difficulty bending, stretching, and "[g]etting papers in the right order." (Tr. 516.)

The plaintiff related that pseudogout has caused her right foot to point out at almost a 90 degree angle and that she experiences significant pain if she tries to point that foot forward. (Tr. 519.) She related that her examining orthopedist and examining rheumatologist have been unable to develop a treatment plan for her pseudogout and that she has to deal with "stabbing" pain in her hip on a daily basis. (Tr. 519-20.)

The plaintiff also testified that she had back surgery in 1993, which reduced her back pain for "three or four years," but due to arthritic conditions, the pain and weakness in her lower back had returned. (Tr. 521.) She related that her lower back pain causes her to change positions frequently throughout the day, from sitting to standing to lying down but that she lies down for no more than one hour at a time. (Tr. 521-22.) The plaintiff testified that surgery largely corrected her carpal tunnel syndrome but that she suffers from right trigger thumb pain, which was "helped a little bit"

by a localized injection. (Tr. 522.) The plaintiff also related that she had a successful cervical diskectomy in 2002, which improved her shoulder and neck problems, but that she was now suffering from "fibromyalgia in [her] arms." She explained that her pain prior to the cervical diskectomy was a "shooting pain" but that her current pain was "more like an aching and sometimes throbbing" pain. (Tr. 523.)

The plaintiff described fibromyalgia as "undefined pain," explained that she had fibromyalgia in her arms and upper back, and related that she was not able to lift things as she used to and has had difficulty picking up a ten pound bag of potatoes. (Tr. 524.) She testified that she is receiving treatment for diabetes and depression but that her depression medication is prescribed for pain, and that depression has contributed to her loss of memory.[35] (Tr. 525.)

The VE, consistent with the Dictionary of Occupational Titles, classified the plaintiff's past relevant work as an administrative assistant who "works with training materials" as sedentary and skilled, her job as a bookkeeper as sedentary and skilled, her job as an office manager as sedentary and skilled, her job as a telecommunicator as sedentary and skilled, and her job as a photocopier as light and unskilled, unless she worked in a supervisory role, in which case that work would be light and semi-skilled. (Tr. 512-13.)

### III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on April 7, 2008. (Tr. 16.) Based on the record, the ALJ made the following findings:

---

[35] Page 526 of the Administrative Record, part of the Hearing Transcript, is absent from the record in this case.

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2.  The record fails to establish that claimant has not engaged in substantial gainful activity since February 2, 2004, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*).

* * *

3.  The claimant has the following severe impairments: pseudogout of the right hip; and osteoarthritis of the spine (20 CFR 404.1520(c)).

* * *

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity for light work (lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for 2 hours out of 8 hours, and sit for 6 hours out of 8 hours).

* * *

6.  The claimant, born on October 31, 1955, was 48 years old, which is defined as a younger individual, on the alleged disability onset date (20 CFR 404.1563).

7.  The claimant has a high school (12th grade) education and is able to communicate in English (20 CFR 404.1564).

8.  The claimant is capable of performing past relevant work as an administrative assistant, bookkeeper, office manager, bank supervisor, and telecommunicator. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

* * *

9.      The claimant has not been under a "disability," as defined in the Social Security Act, from February 2, 2004 through the date of the decision (20 CFR 404.1520(f)).

(Tr. 21-27.)


# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)); *Jones* v. *Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding

appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work."); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595; *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the plaintiff can perform, she is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009); *Her*, 203 F.3d at 391. *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The Five Step Process

In this case, the ALJ resolved the plaintiff's claim at step four of the five step process. (Tr. 26.)  At step one, the ALJ determined that the plaintiff failed to establish that she had not engaged in substantial gainful activity ("SGA") since February 2, 2004, her alleged onset date. (Tr. 21.)  Instead, the ALJ found that the plaintiff had engaged in SGA until May of 2007. (Tr. 22.)  At step two, the ALJ determined that the plaintiff's "pseudogout of the right hip" and "osteoarthritis of the spine" were severe impairments. *Id.*  At step three, the ALJ determined that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 22-23.)  At step four, the ALJ concluded that the plaintiff was able to perform her past relevant work as an administrative assistant, a bookkeeper, an office manager, a bank supervisor, and a telecommunicator. (Tr. 26.)

### C.  The Plaintiff's Assertions of Error

The plaintiff contends that the ALJ erred in finding that the plaintiff was engaged in SGA until May of 2007, in concluding that the plaintiff's affective disorder, "myalgia/fibromyalgia muscle pain," obesity, diabetes, and hypertension were not "severe" impairments, and in determining that the plaintiff's subjective complaints of pain were not credible. Docket Entry No. 15, at 27-28, 30-35.  She also argues that the ALJ erred in disregarding the statements of three lay witnesses, in concluding that she retained the RFC to perform light work, and in finding that she was a "younger individual." Docket Entry No. 15, at 29, 32, 35.

**1. The ALJ erred in finding that the plaintiff had engaged in SGA until May 2007.**

In light of her amended onset date of May 23, 2007, *see* tr. 489-90, it is not clear to the Court why the plaintiff contends that the ALJ erred in finding that she was engaged in SGA until May of 2007. Docket Entry No. 15, at 27. However, she challenges the ALJ's reliance on her adjusted gross income ("AGI") for 2006, instead of relying on the Social Security Administrations's own computational earnings for 2006, in concluding that she was still engaged in SGA. *Id.*

The Regulations note that SGA is comprised of "work activity that is both substantial and gainful." 20 C.F.R. § 404.1572. Substantial work activity is defined as "work activity that involves doing significant physical or mental activities . . . . even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before," and gainful work activity is defined as "work activity that you do for pay or profit . . . . whether or not a profit is realized." 20 C.F.R. § 404.1572(a)-(b). In determining whether a plaintiff's work activity as an employee shows that she is able to perform SGA, the Regulations have adopted an objective earnings based standard that is tied to her average monthly earnings.[36] 20 C.F.R. § 404.1574(a)(1) ("Generally, in evaluating your work activity for [SGA] purposes, our primary consideration will be the earnings you derive from the work activity.").

The ALJ concluded that the plaintiff had engaged in SGA after February 2, 2004, her alleged onset date, since she testified that she worked on a part-time basis from January of 2005 to May of

--------

[36] The Social Security Administration website provides the monthly earnings amounts considered for determining SGA. It notes that "[a] person who is earning more than a certain monthly amount (net of impairment-related work expenses) is ordinarily considered to be engaging in SGA." Social Security Online, "Automatic Increases: Substantial Gainful Activity," http://www.ssa.gov/OACT/COLA/sga.html.

2007 and "failed to address the copies of her 2006 Turbo Tax Federal Tax Return Summary . . . which reflects an adjusted gross income of $22,546.00." (Tr. 21-22, 469, 473, 478, 514-15.) However, as the plaintiff correctly argues, the ALJ should have only considered her earnings, and not her AGI, when determining if she were still engaged in SGA. Docket Entry No. 15 at 27.

In relying on the AGI from the plaintiff's 2006 federal tax return to conclude that she was still engaged in SGA for that year, the ALJ took into account all of the plaintiff's income from that year instead of just her earnings from work. (Tr. 21-22.) Instead, the ALJ should have relied on the Social Security Administration's own computational earnings worksheets which show that the plaintiff made $9,525.00, or $793.75 a month, in 2006 and $0.00 in 2007. (Tr. 61-67.) The Social Security Administration's wage index table indicates that a non-blind individual had to earn more than $860.00 a month in 2006 and more than $900.00 a month in 2007 to be considered engaged in SGA. Social Security Online, "Automatic Increases: Substantial Gainful Activity," http://www.ssa.gov/OACT/COLA/sga.html. The plaintiff does not meet the threshold amount for 2006 or 2007 and thus was not engaged in SGA for either year.

Although the plaintiff was not engaged in SGA in 2006 or 2007, her computational earnings indicate that she was engaged in SGA in 2005. (Tr. 61.) The Social Security Administration's wage index table indicates that for 2005 a non-blind individual must have earned more than $830.00 a month to be still considered engaged in SGA. Social Security Online, "Automatic Increases: Substantial Gainful Activity," http://www.ssa.gov/OACT/COLA/sga.html. In 2005, the plaintiff earned $11,726.00, or about $977.00 a month. (Tr. 61.) Therefore, she was still engaged in SGA in 2005, but not in 2006 or any part of 2007, as erroneously determined by the ALJ.

**2. At step two of the five step sequential process, the ALJ properly determined the severity of the plaintiff's affective disorder, diabetes, and hypertension and committed harmless error in finding that her obesity and "myalgia/fibromyalgia muscle pain" were not severe impairments.**

The plaintiff contends that the ALJ erred in assessing the severity of her affective disorder, diabetes, hypertension, obesity, and "myalgia/fibromyalgia muscle pain" at step two in the five step sequential process. Docket Entry No. 27, 30-32.

According to 20 C.F.R. § 404.1520(c), which codifies step two of the five step sequential process, an impairment is considered severe if that impairment "limits your physical or mental ability to do basic work activities." *See also* 20 C.F.R. § 404.1521 ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities."); *Murphy v. Sec'y of Health & Human Servs.*, 801 F.2d 182, 185 (6th Cir. 1986) ("An impairment can be considered not severe only if the impairment would not affect the plaintiff's ability to work regardless of his age, education, and work experience.") (citing *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 691-92 (6th Cir. 1985); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 90 (6th Cir. 1985)).  The Regulations define basic work activities as being the "'abilities and aptitudes necessary to do most jobs,' and include: (1) physical functions; (2) the capacity to see, hear and speak; (3) '[u]nderstanding, carrying out, and remembering simple instructions;' (4) '[u]se of judgment;' (5) '[r]esponding appropriately to supervision, co-workers, and usual work situations;' and (6) '[d]ealing with change in a routine work setting.'" *Simpson v. Comm'r Soc. Sec.*, 344 Fed. Appx. 181, 190 (6th Cir. Aug. 27, 2009) (quoting 20 C.F.R. §§ 404.1521(a)-(b) and 416.921(a)-(b)).  The Sixth Circuit has construed the step two severity determination as a "de minimis" hurdle in the five step sequential process, but it still effectively

screens out "claims that are 'totally groundless' solely from a medical standpoint." *Higgs*, 880 F.2d at 862-63 (quoting *Farris*, 773 F.2d at 89-90 and citing *Murphy*, 801 F.2d at 185).

When assessing the severity of an individual's mental impairment, such as the plaintiff's affective disorder, the ALJ's written decision must include findings based upon a "special technique." 20 C.F.R. §§ 404.1520a(a). The special technique is a series of steps delineated in subsections (b) through (e) of 20 C.F.R. § 404.1520a. First, the ALJ is required to evaluate the plaintiff's "pertinent symptoms, signs, and laboratory findings to determine whether [the plaintiff has] a medically determinable mental impairment(s)."[37] 20 C.F.R. § 404.1520a(b)(1). Next, the ALJ must assess the plaintiff's degree of functional limitation caused by the mental impairment. 20 C.F.R. §§ 404.1520a(b)(2). The regulations acknowledge the individualized nature of this step by requiring the ALJ "to consider multiple issues and all relevant evidence to obtain a longitudinal picture of [the plaintiff's] overall degree of functional limitation." 20 C.F.R. §§ 404.1520a(c)(1). Thus, the ALJ must "consider all relevant and available clinical signs and laboratory findings, the effects of [the plaintiff's] symptoms, and how [the plaintiff's] functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment." *Id.*

After considering all the available relevant evidence, the ALJ must rate the plaintiff's functional limitation in the four following functional areas: activities of daily living; social

---

[37] If the ALJ determines that the plaintiff has a medically determinable mental impairment, the ALJ must provide detailed support for such findings in accordance with 20 C.F.R. § 404.1520a(e).

functioning; concentration, persistence, or pace; and episodes of decompensation.[38] 20 C.F.R. § 404.1520a(c)(3). These four functional limitations are known as the "B" criteria. The term "B criteria" corresponds to the paragraph "B" criteria of the expansive list of mental disorders in 20 C.F.R. Pt. 404, Subpt. P, App. 1. The regulations require the ALJ to attach a point value to each of the four functional areas. 20 C.F.R. §§ 404.1520a(c)(4). For the first three categories, the regulations set forth a five-point assessment scale: none, mild, moderate, marked, and extreme. *Id.* The fourth category, episodes of decompensation, is rated with a four point scale: none, one or two, three, four or more. *Id.* "If the ALJ rates the first three functional areas as 'none' or 'mild' and the fourth area as 'none,' the impairment is generally not considered severe and the [plaintiff] is conclusively not disabled." *Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 653 (6th Cir. 2009) (quoting 20 C.F.R. § 404.1520a(d)(1)).

The ALJ is also required to follow 20 C.F.R. § 404.1520a(e) in documenting the application of the special technique. The ALJ's written decision must include the germane findings and conclusions based on the special technique; show the plaintiff's significant history, such as medical examinations and laboratory findings, and the functional limitations considered in determining the severity of the plaintiff's mental impairments; and provide a specific finding regarding the level of the plaintiff's limitation in each of the four functional areas listed in 20 C.F.R. § 404.1520a(c)(3).[39] 20 C.F.R. § 404.1520a(e)(2).

---

[38] Decompensation is the "failure of defense mechanisms resulting in progressive personality disintegration." Dorland's at 478.

[39] Since 2000, the ALJ is no longer required to completed a Psychiatric Review Technique Form ("PRTF"). *Rabbers*, 582 F.3d at 653-54. The regulations only require that an ALJ's written decision "'incorporate the pertinent findings and conclusions based on the [special] technique.'" *Id.* (quoting 20 C.F.R. § 404.1520a(e)(2)).

In this case, the plaintiff contends that the ALJ erred in rejecting the severity of her mental limitation complaints primarily "because she failed to seek treatment from mental health individuals" even though she could not afford such treatment. Docket Entry No. 15, at 35. The ALJ did acknowledge that the plaintiff's medical records "show[ed] no history of mental health treatment, outpatient therapy, or psychiatric hospitalizations" (tr. 22), but that was not the only record evidence upon which he relied in determining that her affective disorder was not severe. He noted that Dr. Lagrone prescribed Cymbalta, typically used to treat depression, as a pain reliever and not as an anti-depressant, and that Dr. Pullias, one of the plaintiff's treating physicians, opined that her depression was "stable." (Tr. 22, 364, 462.) Next, he found that Mr. Proffitt's psychological evaluation was not entitled to significant weight since he only examined the plaintiff on one occasion, "there are no mental health records to substantiate his opinion," "his assessment is based solely on the [plaintiff's] reports of subjective mental limitations," and his evaluation was in "complete conflict" with Dr. Pullias' determination that the plaintiff's depression was "stable and controlled." (Tr. 22.)

There is nothing in the record that undercuts the ALJ's determination that the plaintiff's affective disorder was not a severe impairment. In May of 2005, Dr. Beatty completed a mental evaluation and found that the plaintiff did not suffer from a mental limitation (tr. 173-74), and in April of 2006, Dr. Lagrone prescribed Cymbalta, an anti-depressant and neuropathic pain reliever, for the plaintiff's myofascial pain and not for depression. (Tr. 354.) Although, in July of 2007, Mr. Proffitt diagnosed the plaintiff with dysthymic disorder and noted that "her symptoms appear to be of sufficient severity to cause marked impairment in her ability to relate to others and to engage in tasks with concentration and persistence" (tr. 347), subsequent examinations by

Dr. Pullias revealed that her "neurotic depression" was "stable" and that she appeared to be in no distress, had appropriate judgment, and had a normal memory, mood, and affect. (Tr. 364, 461-62.) Further, the "mere diagnosis . . . says nothing about the severity of the condition." *Higgs*, 880 F.2d at 863. The evidence in the record, as detailed by the ALJ, indicates that the plaintiff was diagnosed with a mild form of depression that was subsequently controlled by prescribed medication.

The ALJ also complied with 20 C.F.R. § 404.1520a(c)(3) and rated the plaintiff's functional limitations in the requisite four functional areas. He determined that the plaintiff had "no more than slight limitations in mental functioning" and that "[t]hese findings are consistent with the following "B" criteria of the listings: no restriction in activities of daily living; no difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of extended decompensation in a work or work-like setting." (Tr. 22.) The ALJ clearly delineated the four functional areas that he considered and provided a specific finding for each before concluding that the plaintiff's affective disorder was not a severe impairment. *See Rabbers* 582 F.3d at 653. In sum, the record evidence does not show that the plaintiff suffered from a severe affective disorder and the ALJ complied with 20 C.F.R. § 404.1520a in making that determination.

Next, the plaintiff contends that the ALJ erred in concluding that her diabetes and hypertension were not severe impairments. Docket Entry No. 15, at 30-31. The ALJ supported that determination by noting that the plaintiff "stated [that] her diabetes was not severe and caused no limitations" and that "[t]here is evidence in the record to establish that [her hypertension] is well controlled by medication and no evidence of end organ damage." (Tr. 22.) The record contains multiple treatment notes indicating that both her diabetes and hypertension were either "satisfactory" or being controlled by medication. (Tr. 188, 203, 363-64, 366-67, 462.) Further the plaintiff testified

that although she was being treated for diabetes, she was not taking insulin.[40] (Tr. 525.) The record evidence simply does not support the plaintiff's complaints that her diabetes and hypertension significantly limit her physical abilities. Thus, the ALJ properly concluded that her diabetes and hypertension were not severe impairments.

The plaintiff also argues that the ALJ erred in finding that her obesity was not a severe impairment. Docket Entry No. 15, at 30-32. While it is true that the ALJ did not address the plaintiff's obesity at step two of the five step sequential evaluation, he did properly consider it at step four. (Tr. 26.) Even assuming, arguendo, that the plaintiff's obesity is a severe impairment and that the ALJ failed to address it at step two, "the error is harmless as long as the ALJ found at least one severe impairment and continued the sequential analysis and ultimately addressed all of the [plaintiff's] impairments in determining her residual functional capacity." *Swartz v. Barnhart*, 188 Fed. Appx. 361, 368 (6th Cir. July 13, 2006) (citing *Mazjarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)). *See also* 20 C.F.R. 404.1523 (When making a disability determination, the Regulations require that if one severe impairment exists, "we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.").

In this case, the ALJ took into account the plaintiff's obesity in making his RFC determination at step four of the sequential process. (Tr. 26.) He noted that the plaintiff's RFC "accommodated [her] obesity pursuant to Social Security Ruling 02-01." *Id.* Even though obesity

---

[40] The ALJ noted that the plaintiff testified that "her diabetes was not severe and caused no limitations" (tr. 22), but when the plaintiff was asked if her diabetes caused her any functional limitations, the plaintiff did not answer that question directly and instead responded that "I just, you know, I try not to eat any sugar is all, and I keep and eye on it, you know. I check my blood. I am -on medication but it is not insulin." (Tr. 525.)

is to be considered during the disability determination, it "*may or may not* increase the severity or functional limitations of the other impairment" and should be evaluated on a case by case basis. Soc. Sec. Rul. 02-01p, 2000 WL 628049, at *6 (emphasis added). Moreover, obesity "is 'not severe' only if it is a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the individual's ability to do basic work activities." *Id.* at *5. The record indicates that the plaintiff was diagnosed with obesity on multiple occasions (tr. 175-82, 188, 323-24, 326, 328-30), but she has never alleged that this impairment had any effect on her ability to work (tr. 84, 518-28) and no physician has ever attributed her limitations directly to obesity. Plainly stated, the record evidence does not indicate that the plaintiff's obesity is a severe impairment and even if it were, the ALJ's failure to address it at step two is harmless error since he discussed it in making his RFC determination.

Finally, the plaintiff correctly points out that the ALJ failed to address her "myalgia/fibromyalgia muscle pain" at step two of the sequential process. Docket Entry No. 15, at 30-32. However, as discussed *supra*, the ALJ's failure to address the plaintiff's myalgia/fibromyalgia at step four of the sequential process is harmless error. (Tr. 26). *See Swartz,* 188 Fed. Appx. at 368 (citing *Mazjarz*, 837 F.2d at 244). The ALJ found that "[w]hile there is evidence of . . . fibromyalgia, the objective findings are relatively mild and the [plaintiff] has responded well to treatment." (Tr. 26.) Although the plaintiff was diagnosed with myalgia/fibromyalgia (tr.364) and myofascial pain (tr. 214, 354, 487), in November of 2006, Dr. Pullias noted that she was "[d]oing well overall" and that she had normal aches and pains which were "under reasonable control per her rheumatologist [Dr. Lagrone]" (tr. 366) and in January of 2007, Dr. Lagrone found that she was "able to function" on her prescribed pain relievers. (Tr. 354.)

In October of 2007, the plaintiff returned to Dr. Lagrone and he opined that she continued to suffer from back and hip pain that was "mainly myofascial" in nature and that her poor sleeping habits had aggravated her fibromyalgia. (Tr. 487.)

While the record is replete with treatment notes indicating that the plaintiff was diagnosed with back pain/osteoarthritis (tr.188, 213-14, 270, 272, 278, 254, 487) or hip pain/pseudogout (tr. 175-82, 188, 209, 211, 234, 354, 487, 495, 497), which the ALJ determined were severe impairments (tr. 22), the record also indicates that she was diagnosed with myalgia/fibromyalgia on only two occasions (tr. 364, 487) and that those symptoms were reasonably controlled by medication. (Tr. 354, 366.) In sum, the ALJ's failure to address the plaintiff's myalgia/fibromyalgia at step two is harmless error since he discussed it at step four of the sequential evaluation and his step four determination is supported by substantial evidence in the record.

### 3. The ALJ did not err in analyzing the plaintiff's subjective complaints of pain.

The plaintiff contends that the ALJ erred in evaluating the credibility of her subjective complaints of pain by finding her not fully credible. Docket Entry No. 15, at 32-35. The ALJ found that the plaintiff's

> medically determinable impairments would not reasonably be expected to produce the alleged symptoms and the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment. While there is evidence of pseudo gout and fibromyalgia, the objective findings are relatively mild and the [plaintiff] has responded well to treatment. Given the [plaintiff's] allegations of totally disabling symptoms, one would expect to see some indication in the treatment records of restrictions placed on the [plaintiff] by a treating physician. Yet, a review of the record in this case reveals no restrictions recommended by a treating physician. The medical evidence simply does not support the [plaintiff's] allegations of disability.

The [plaintiff's] residual functional capacity is well supported by the weight of the evidence, the objective medical findings, the [plaintiff's] established range of daily activities, and the opinion of Dr. Pelmore . . . .

(Tr. 26.)

The ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision of credibility rests with the ALJ. The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the [plaintiff] and judge [his] subjective complaints." *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the [plaintiff]'s complaints as incredible, he must clearly state his reason for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp.2d 954, 958 (N.D. Ohio 2003) (citing *Felisky*, 35 F.3d at 1036).

Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record, and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL 374186, at *4. In assessing the plaintiff's credibility, the ALJ must consider the record as a whole, including the plaintiff's complaints, lab findings, information provided by treating physicians, and other relevant evidence. *Id.* at *5. Consistency between the plaintiff's subjective complaints and the record evidence "tends to support the credibility of the [plaintiff], while inconsistency, although not necessarily defeating, should have the opposite effect." *Kalmbach v. Comm'r of Soc. Sec.,* 2011 WL 63602, at *11 (6th Cir. Jan. 7, 2011). The ALJ must explain his credibility determination such that both the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reason for that weight. Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *4.

Both the Social Security Administration ("SSA") and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain. See 20 C.F.R. § 404.1529;

-31-

*Felisky*, 35 F.3d at 1037.  While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there.  The Sixth Circuit in *Duncan v. Secretary of Health and Human Servs.*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[41]  The *Duncan* test has two prongs.  The first prong is whether there is objective medical evidence of an underlying medical condition.  *Felisky*, 35 F.3d at 1039 (quoting *Duncan*, 801 F.2d at 853).  The second prong has two parts: "(1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." *Id.*  This test does not require objective evidence of the pain itself.  *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

There is evidence of underlying physical medical conditions: the plaintiff was diagnosed with back pain/osteoarthritis (tr.188, 213-14, 270, 272, 278, 254, 487), hip pain/pseudogout (tr. 175-82, 188, 209, 211, 234, 354, 487, 495, 497), and myalgia/fibromyalgia on only two occasions. (Tr. 364, 487.)  Given that the second prong of the *Duncan* test consists of two alternatives, the plaintiff must only meet one of the following two elements: the objective medical evidence "confirms the severity of the alleged pain arising from the condition" or the "objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain."  The SSA provides a checklist of factors to assess symptoms, including pain, in 20 C.F.R. § 404.1529(c).  The ALJ cannot ignore a plaintiff's statements detailing the symptoms, persistence, or intensity of her pain simply because current objective medical evidence does not fully corroborate

---

[41] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n.2.

the plaintiff's statements. 20 C.F.R. § 404.1529(c)(2).  Besides reviewing medical records to address the credibility of a plaintiff's symptoms of pain, an ALJ must review the entire case record in light of the seven factors set forth in 20 C.F.R. § 404.1529(c)(3).[42]

In making his credibility determination, the ALJ relied on the medical records from treating and examining sources, the objective medical evidence, and the plaintiff's daily activities. (Tr. 24-26.)  First, as discussed *supra*, although the plaintiff was diagnosed with myalgia/fibromyalgia (tr. 364, 487) and myofascial pain (tr. 214, 354, 487), in November of 2006, Dr. Pullias noted that she was "[d]oing well overall" and that she had normal aches and pains which were "under reasonable control per her rheumatologist" (tr. 25, 366) and in January of 2007, Dr. Lagrone found that she was "able to function" on her prescribed pain relievers. (Tr. 25, 354.)  Next, Dr. Pelmore, a consultative examining physician, and Dr. Bell, a non-examining DDS physician, also evaluated the plaintiff's physical limitations and determined that in an eight hour workday she could lift/carry 20 pounds occasionally and 10 pounds frequently, could stand and/or walk for six out of eight hours, and could sit for two hours out of eight hours. (Tr. 25, 189-90, 193.)  Although Dr. Pelmore found that the plaintiff could not fully extend her right hip and had difficulty squatting and rising, she noted that the plaintiff did not use an assistive device and was able to get on and off the examining

---

[42] The seven factors under 20 C.F.R. § 404.1529(c)(3) include: (i) the plaintiff's daily activities, (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms, (iii) precipitating and aggravating factors, (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms, (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms, (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on her back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.), and (vii) other factors concerning plaintiff's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

table without assistance, that range of motion tests indicated that her back extension and flexion and neck rotation were slightly limited, and that her back was not tender. (Tr. 25, 186-88, 191.)

Finally, the plaintiff reported that she is able to care for her daughter and take her places, prepare simple meals, do laundry, mow grass with a riding mower, shop with the assistance of a riding cart, drive a car, attend church, and feed and bathe her two dogs. (Tr. 118-25, 347.) The plaintiff's former mother-in-law, Marilyn Blanks, reported that while the plaintiff tires easily, she is able to care for her daughter, do laundry, dust, and change her bed. (Tr. 126-33.) The plaintiff's friend, Donna Cherry, also noted that she is able to shop, visit with friends, attend church and her daughter's sporting events, prepare meals, dust, vacuum, do laundry, go out to eat, and follow directions "very well." (Tr. 134-39.)

The plaintiff argues that even though she is able to shop with a cart, perform household chores with frequent breaks, and attend church weekly, *Rogers* "makes it clear that such activities do not support an adverse credibility finding." Docket Entry No. 15, at 35; *Rogers*, 486 F.3d at 241. However, *Rogers* is factually different from this case. In *Rogers*, the severity of the plaintiff's debilitating fibromyalgic condition was well documented by multiple physicians and the plaintiff specifically "indicated that she does very little driving due to her inability to sit for longer than a few minutes; that she engages in light housekeeping only; that the extent of her care for her dog includes opening the door to let him out in the morning; that she likes to read but has difficulty holding a book; that fixing meals usually means a sandwich or cereal; and that buttoning her shirt is difficult due to the numbness in her fingers." *Rogers*, 486 F.3d at 237-41, 249. As discussed *supra*, the plaintiff in this case was diagnosed with myalgia/fibromyalgia (tr.364, 487) and myofascial pain (tr. 214, 354, 487), but her treating physician noted that she was "[d]oing well overall" and that her

normal aches and pains which were "under reasonable control per her rheumatologist" (tr. 366) and her treating rheumatologist found that she was "able to function" on her prescribed pain relievers. (Tr. 354.) Further, the plaintiff in this case is considerably more mobile and participates in more activities than did the plaintiff in *Rogers.*

In sum, the medical reports of the plaintiff's treating and examining sources, the objective medical evidence, and the plaintiff's activities of daily living demonstrate that her physical impairments cause her a certain amount of pain, but that same record medical evidence does not support the plaintiff's subjective complaints that her pain is disabling.

### 4. The ALJ did not disregard the statements of three lay witnesses.

The plaintiff contends that the ALJ failed to give perceptible weight to the Function Reports of Marilyn Blanks, her former mother-in-law, Donna Cherry, her friend, and Andrea Carroll, her friend and former boss. Docket Entry No. 15, at 32. The testimony of lay witnesses "is entitled to perceptible weight only if it is supported by the reports of the treating physicians." *Simons v. Barnhart*, 114 Fed. Appx. 727, 733 (6th Cir. Nov. 18, 2004) (citing *Lashley v. Sec'y of Soc. Sec.*, 708 F.2d 1048, 1054 (6th Cir.1983)). Here, the ALJ did not ignore the statements of the Ms. Blanks, Ms. Cherry, and Ms. Carroll and, in fact, addressed and relied on their statements in determining the plaintiff's RFC. (Tr. 24.)

**5. The ALJ erred in determining that the plaintiff retained the RFC to perform light work but not in concluding that she could perform some of her past relevant work.**

The plaintiff contends that the ALJ erred in determining that she has an RFC to perform light work and in finding that she could perform her past work as an administrative assistant, bookkeeper, office manager, bank supervisor, and telecommunicator. Docket Entry No. 15, at 29-30, 36. The ALJ relied substantially on Dr. Pelmore's physical evaluation in concluding that the plaintiff "has the residual functional capacity for light work (lift and or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for 2 hours out of 8 hours, and sit for 6 hours out of 8 hours)." (Tr. 23, 26.) The Regulations define light work as

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

As the plaintiff correctly points out, an individual who can stand/walk for only two hours in an eight hour work day would not be able to perform light work. Jobs classified as light work have the potential of requiring an individual to do a "good deal of walking or standing" and since the plaintiff is able to walk/stand for two hours out of an eight hour work day, or for only one quarter of the work day, she would not "have the ability to do substantially all of" the required walking/standing. 20 C.F.R. § 404.1567(b). Instead, the ALJ should have determined that the plaintiff could perform sedentary work. The Regulations define sedentary work as

lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a). The ALJ's finding that the plaintiff could only stand/walk for two hours in an eight hour work day more closely aligns with a sedentary RFC, which primarily involves sitting and only occasional walking/standing, than with a light RFC, which requires "a good deal of walking or standing." 20 C.F.R. § 404.1567(a)-(b).

Even though the ALJ erred in finding that the plaintiff had an RFC to perform light work, she is still able to perform most of her past relevant work. The VE classified the plaintiff's past job as an administrative assistant "working with training materials" as sedentary and skilled, her job as a bookkeeper as sedentary and skilled, her job as an office manager as sedentary and skilled, her job as a telecommunicator as sedentary and skilled, and her job as a bank supervisor[43] as light and unskilled, unless she worked in a supervisory role, in which case that work would be light and semi-skilled. (Tr. 512-13.) Therefore, with a sedentary RFC, the plaintiff could perform her past relevant work as an administrative assistant, bookkeeper, office manager, and telecommunicator. *Id.*

The plaintiff also argues that she is not able to do skilled work since "her concentration and persistence deteriorated to the point that she could not even perform simple tasks like putting papers in order." Docket Entry No. 15, at 36. A letter from the plaintiff's former boss indicated that she was "extremely forgetful" (tr. 171) and in July of 2007, Mr. Proffitt found that her depressive symptoms caused a marked impairment in her ability "to engage in tasks with concentration and

---

[43] The ALJ listed one of the plaintiff's past jobs as bank supervisor (tr. 26) but the VE, at the hearing, described the same position as a supervisor of photocopying. (Tr. 512.)

persistence." (Tr. 347.)  However, in other Function Reports, the plaintiff reported that she had no problems with paying attention unless she was "unusually tired" (tr.123) and Ms. Blanks related that she had no difficulty paying attention (tr. 131), and the plaintiff, Ms. Blanks, and Ms. Cherry all reported that she could follow written and spoken instructions "very well." (Tr. 123, 131, 139.) Further, in December of 2007, Dr. Pullias opined that the plaintiff appeared to be in no distress, had appropriate judgment, and had a normal memory, mood, and affect (tr. 461), and, as discussed *supra*, the plaintiff's affective disorder was not severe.  Thus, there is substantial evidence in the record to support the ALJ's determination that the plaintiff's concentration and persistence would not preclude her from performing skilled work.

Lastly, the plaintiff contends that the ALJ erred in concluding that she was a "younger individual." Docket Entry No. 15, at 35-36.  The Court will not address this argument since a plaintiff's age is not taken into consideration until step five of the sequential process, 20 C.F.R. § 404.1520 (g)(1) ("If we find that you cannot do your past relevant work because you have a severe impairment(s) (or you do not have any past relevant work), we will consider the same residual functional capacity assessment we made under paragraph (e) of this section, together with your vocational factors (your age, education, and work experience) to determine if you can make an adjustment to other work."), and as discussed *supra* the ALJ properly determined at step four of the sequential process that the plaintiff could return to her past relevant work.

## V.  RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 12) be DENIED and that this action be DISMISSED.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of the Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


Respectfully submitted,


_____
JULIET GRIFFIN
United States Magistrate Judge